J-S80011-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| M.H.W. AND M.A.M. | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellee | | |
| v. | | |
| C.J.O.. | | |
| Appellant | | No. 731 MDA 2016 |

Appeal from the Order May 5, 2016
In the Court of Common Pleas of Centre County
Civil Division at No(s): 2016-1108

BEFORE:  LAZARUS, J., STABILE, J., and RANSOM, J.

MEMORANDUM BY LAZARUS, J.:　　　　　　　　　**FILED DECEMBER 05, 2016**

Defendant C.J.O. appeals from a final protection from abuse (PFA) order,[1] pursuant to 23 Pa.C.S. § 6102(a)(2), entered against him in the Court of Common Pleas of Centre County.[2]  After careful review, we reverse.

C.J.O. and M.H.W. were married for two years before they divorced in October 2009.  A child was born of the marriage; however, she was given up for adoption.  M.H.W. testified that the parties' marital relationship was "tumultuous" and that C.J.O. was "abusive, constantly [fought], hit[], and [made] death threats."  N.T. PFA Hearing, 4/6/16, at 4.  Around the time of

---

[1] **See**  23 Pa.C.S. §§ 6101-6122 (Protection from Abuse Act ("PFAA")).

[2] Our standard of review for PFA orders is well settled.  [W]e review the trial court's legal conclusions for an error of law or abuse of discretion." **Stamus v. Dutcavich**, 938 A.2d 1098, 1100 (Pa. Super. 2007) (quotation and citation omitted).

the divorce, M.H.W. called 9-1-1 alleging that C.J.O. had hit her and threatened her life while the couple was at a concert in State College. As a result, C.J.O. was arrested and served time in jail. In December 2009, C.J.O. was released from prison, on probation. On January 13, 2010, M.H.W. filed a PFA petition against C.J.O. as a result of him continuously calling, texting and emailing her. The court granted the PFA petition ("2010 PFA"), effective for three years; it prohibited C.J.O. from having contact with M.H.W., her daughter, M.A.M., and M.A.M.'s father, K.P.M. C.J.O., however, immediately violated the PFA order by texting and emailing M.H.W.; as a result, C.J.O. was sentenced to 30 days in jail and another 12 months' imprisonment for violating his probation.[3] In 2013, M.H.W. had the 2010 PFA order extended; it expired on March 22, 2016.

In 2013, C.J.O. married K.P., whom he subsequently divorced in February 2016. C.J.O. testified that K.P. was "extremely upset about [his filing for divorce]" and that she had become "extremely verbally abusive with [C.J.O.], physically abusive with [him]" and "would bring up [M.H.W.] all the time." N.T. PFA Hearing, 4/6/16, at 18. C.J.O. also testified that K.P. "didn't like [M.H.W.] at all." *Id.*

M.H.W. did not have any contact with C.J.O. for approximately six years, until she received the following text message on March 30, 2016:

---

[3] M.H.W. changed her phone number in 2010 and did not give C.J.O. her new telephone number.

> I'm not going to bother you after this, but I just want to let you know, M[.H.W.], that you truly were the love of my life. I am so sorry for failing you, and for not being a Christian husband as I should have been. I know what that what [sic] corrupt county did to you was not you. I do forgive you for that. There's too much to text but I really wanted you to know how deeply sorry I am, and I will never stop loving you. I'm sorry. You truly were my everything. I'm so sorry for A[.] and everything. I really am. I won't bother you anymore.

Petition for Protection from Abuse, 4/1/16, at ¶9. As a result of this text message, M.H.W. filed a new PFA petition on April 1, 2016, as the 2010 PFA had expired. On April 7, 2016, the court granted the petition[4] and entered its final PFA order on May 5, 2016.[5] C.J.O. filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal.

On appeal, C.J.O. presents the following issues for our review:

(1)     The Court below erred in finding that Plaintiff demonstrated by a preponderance of the evidence that Defendant sent the complained-of text message to Plaintiff.

(2)     The Court below erred in finding that the complained-of-conduct, even if committed by Defendant, constituted "abuse" within the meaning of 23 Pa.C.S.A. § 6102, because Plaintiff did not demonstrate by a preponderance of the evidence that the complained-of-conduct placed her in reasonable fear of imminent serious bodily injury.

---

[4] The instant PFA order will expire on April 6, 2019.

[5] The final PFA order was originally entered incorrectly on the docket of the expired, 2010 PFA. Subsequently, the court entered the instant order on the correct docket number on May 5, 2016. C.J.O. timely filed his notice of appeal on the following day, May 6, 2016.

The purpose of the PFAA ("Act") is to protect victims of domestic violence from the perpetrators of abuse and to prevent domestic violence from occurring. *Ferko-Fox v. Fox*, 68 A.3d 917, 921 (Pa. Super. 2013). The Act's goal "is not punishment of abusers for past violent behavior, but advance prevention of physical and sexual abuse." *Burke ex rel. Burke v. Bauman*, 814 A.2d 206, 208 (Pa. Super. 2002) (internal citations omitted). Under the PFAA, the petitioner has the burden of proving by a preponderance of the evidence the allegations of abuse. *See* 23 Pa.C.S. § 6107(a).

C.J.O. contends that M.H.W. did not prove, by a preponderance of the evidence, that he sent her the subject text message which formed the basis of the PFA petition. Moreover, C.J.O. asserts that even if the trial court did not find his testimony credible at the PFA hearing, the fact that the subject text message was not produced at the hearing and that M.H.W.'s testimony relied solely upon her "recollection" of the content of the text, the evidence was insufficient to support the conclusion that the text originated from C.J.O.'s phone. We agree.

A claim that the evidence was insufficient to support a PFA order is reviewed under the following standard:

> [W]e review the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable inference, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence.

***Fonner v. Fonner***, 731 A.2d 160, 161 (Pa. Super. 1999) (quoting ***Miller on Behalf of Walker v. Walker***, 665 A.2d 1252, 1255 (Pa. Super. 1995)). A preponderance of the evidence standard is defined as the greater weight of the evidence, *i.e.,* to tip a scale slightly is the criteria or requirement for preponderance of the evidence. ***Raker v. Raker***, 847 A.2d 720, 724 (Pa. Super. 2004). With this standard in mind, we also recognize that it is the trial court's duty to assess the credibility of the witnesses; if the trial court's findings are supported by competent evidence, we are bound by them. ***Coda v. Coda***, 666 A.2d 741, 743 (Pa. Super. 1995).

M.H.W. claims that she authenticated the text message, proving that C.J.O. authored and sent the message, "with substantial circumstantial evidence and [the fact that C.J.O.] admitted the text came from his phone." Appellee's Brief, at 14. Specifically, M.H.W.'s circumstantial evidence consisted of her claim that the expressions within the text message matched the content of previous messages sent to her by C.J.O. almost six years prior. ***See*** Petition for Protection from Abuse, 4/1/16, at 2 (stating text message is "concerning because [C.J.O.'s] past patterns and behaviors . . . have been to shower me with affection to get my attention and then going off the deep end and threatening me and M.A.M. and becoming verbally abuse[ive] and physically abusive.").

In ***Commonwealth v. Mosley***, 114 A.3d 1072 (Pa. Super. 2015), our Court noted:

- 5 -

> With regard to the admissibility of electronic communications, such messages are to be evaluated on a case-by-case basis as any other document to determine whether or not there has been an adequate foundational showing of their relevance and authenticity. **Authentication of electronic communications, like documents, requires more than mere confirmation that the number or address belonged to a particular person. Circumstantial evidence, which tends to corroborate the identity of the sender, is required.**

*Id.* at 1081 (emphasis added) (citation omitted). Generally, the requirement of authentication or identification as a condition precedent to the admissibility of evidence is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Pa.R.E. 901(a).[6]

In **Commonwealth v. Koch**, 39 A.3d 1005 (Pa. Super. 2011), *aff'd*, 106 A.3d 705 (Pa. 2014) (per curiam), our Court noted that under Rule 901, text messages can be authenticated in the following ways: (1) first-hand corroborating testimony from either the author or the sender; and/or (2) circumstantial evidence, which includes distinctive characteristics like information specifying the author-sender, reference to or correspondence with relevant events preceding or following the communication in question; and/or (3) any other facts or aspects of the communication that signify it to be what its proponent claims it to be. The authentication inquiry will, by

---

[6] We note that the "rules of evidence govern proceedings in all courts of the Commonwealth of Pennsylvania's unified judicial system, except as otherwise provided by law." **See** Pa.R.E. 101 (Scope of Rules of Evidence); **see also Ferko-Fox**, **supra** (applying Pa.R.E. 402 and 403 in court's assessment of relevancy of testimony at PFA hearing).

necessity, be evaluated on a case-by-case basis as with any other document to determine whether there has been an adequate foundational showing of its relevance and authenticity. *Id.*

We first note that there was no first-hand corroborative testimony regarding the text message from either its author or the individual who sent it. At the PFA hearing, in response to counsel asking how she knew the text message came from C.J.O., M.H.W. testified with the following circumstantial evidence:

> The contents of the message, him saying that I love you. He used my name. He brought up our daughter. There were things that he had said to me in the past, part of his pattern of I love you, I'll always love you, bringing up our daughter together.
>
> Just the entire contents of the message, it was clear to me who had sent it.

N.T. PFA Hearing, 4/6/16, at 8. On cross-examination, however, M.H.W. testified that other people had told her they loved her, had called her by her name, and had had knowledge of the parties' daughter who was placed for adoption. *Id.* at 10-11.

Moreover, at the PFA hearing M.H.W. testified that she was unable to verify the number or the identity of the person who sent her the subject text message. N.T. PFA Hearing, 4/6/16, at 11. Further, despite her efforts to "Google" the number, she did not receive any results. *Id.* Finally, M.H.W. testified that she "honestly thought that [C.J.O.] had forgotten about [her] because of the amount of time that had gone by [since their last interaction]." *Id.* at 14; *see* Petition for Protection from Abuse, 4/1/16 at ¶

10 ("Since the filing of the second PFA [in 2010] I have not heard from him, I thought he was gone, until the text message I received on March 30, 2016.").

Even discrediting C.J.O.'s testimony and documentary evidence[7] to support his claim that K.P. sent the subject text, we conclude that viewing

_____

[7] At trial, C.J.O. testified that he did not send the subject text message to M.H.W. and that he did not have M.H.W.'s phone number in his cellular phone on March 30, 2016. N.T. PFA Hearing, 4/1/16, at 26-28. He testified that on the same day that the text message was sent from his phone, K.P. had become very aggressive and exhibited threatening behavior when he took back an unauthorized $1,700 charge K.P had made on his credit card. *Id.* at 18-20. C.J.O. testified that K.P. "had actually done a lot of research on M.H.W., finding out where she works, where she lives and where she's going to school," and that he believed she was the one who used his phone and sent M.H.W. the text message. *Id.* at 28. C.J.O. entered into evidence email messages of the charge back to his Capital One credit card account, emails from K.P. admonishing him for proceeding with the charge back, and the following email from K.P.'s gmail.com account:

> Chris
>
> i want to tell you again how sorry I am for sending that message to M[.] You are right and my anger got the best of me. For so long, you kept telling me that she was a Christian, and I am not.
>
> *     *     *
>
> I know it is no consolation but even as bad as Centre County is, and how much they don't follow the law, there is no way they can grant a PFA based on 1 text message that said you were sorry for everything. You[r] old PFA had expired so there is not grounds for a new one.

K.P. Gmail.com Email, 3/31/16.

the evidence in the light most favorable to M.H.W., she did not prove, by a preponderance of the evidence, that the March 30, 2016 text message was sent by C.J.O..

First, we recognize that other than M.H.W.'s recollection of the text, she produced no documentary evidence of the subject text message at trial. Second, C.J.O.'s admission that the text originated from his cellular phone does not establish that he actually authored or sent the text to M.H.W. **Koch**, **supra** (authentication of electronic communications requires more than mere confirmation that the number or address belonged to a particular person). Just as a signature can be forged on a letter, it is widely recognized that "cellular telephones are not always exclusively used by the person to whom the phone number is assigned." **Id.** at 1005. Lastly, while M.H.W. testified that the content of the message was similar to the past pattern of threatening communications he sent almost six years prior, that testimony alone is not enough to circumstantially prove that C.J.O. sent the instant email – especially where she produced no other similarly worded past communications from him.

M.H.W.'s circumstantial evidence is simply not sufficient to sustain the trial court's conclusion that C.J.O. sent the text by a preponderance of the evidence. **Fonner**, **supra**.

Even if we were to find that C.J.O. authored the instant text message, we would reverse the PFA order based on the second issue raised on appeal,

that there was insufficient evidence to prove that C.J.O. committed "abuse," as defined in section 6102 of the (PFAA).

The relevant section of the PFAA reads:

"Abuse." The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood.

\* \* \*

**(2) Placing another in reasonable fear of imminent serious bodily injury.**

\* \* \*

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecution commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S. § 6102(a) (emphasis added).

Instantly, the trial court credited M.H.W.'s testimony and found that there was sufficient evidence to conclude that the text message put M.H.W. in reasonable fear of imminent serious bodily injury under section 6102(a)(2). Specifically, M.H.W. testified that she "was in shock . . . was devastated . . . started to cry and shake and . . . was just hysterical" when she received the text message. N.T. PFA Hearing, 4/6/16, at 8. Additionally, M.H.W. testified that the content of the text message was consistent with C.J.O.'s past patterns of abusive behavior where he would

first "apologize[] for not being the Christian husband that [she] needed or not being a good Christian husband." *Id.* at 13.

Our Court has held that mere annoyance or unwanted communication cannot form the basis of a finding of abuse. *D.H. v. B.O.*, 734 A.2d 409 (Pa. Super. 1999). However, actual physical harm is not a prerequisite for the entry of a PFA order; the victim need only be in reasonable fear of imminent serious bodily injury. 23 Pa.C.S. § 6102(a)(2). Moreover, because it is possible for a person to be placed in reasonable fear of imminent bodily injury based on telephone calls, particularly when coupled with an alleged abuser's past history of violence, *D.H.*, *supra*, we, likewise, believe that a person can establish "abuse" under section 6102(a)(2) based on text messages coupled with a defendant's past abusive behavior.

In *D.H.*, our Court found that the alleged abuser's complained of conduct did not constitute an "act of abuse" under the PFAA where the sole evidence at the PFA hearing consisted of the victim's testimony and his self-compiled telephone log. *Id.* at 411-12. On appeal, the Court concluded that because the alleged abuser had not made any physical threats against the victim, the order could not be upheld on appeal. *Id.* at 412. In reversing the PFA order, our Court also noted that the telephone messages

- 11 -

left by the alleged abuser about unrequited love between him and the victim similarly did not rise to the level of abuse[8] under the PFAA. *Id.*

Under section 6102(a)(2) of the PFAA, the alleged abuse must place another in "reasonable fear of imminent serious bodily injury." While past acts of violence are relevant to the reasonableness of a PFA petitioner's fear, ***Buchhalter v. Buchhalter***, 959 A.2d 1260 (Pa. Super. 2008), under the facts of this case we do not find that M.H.W. was placed in *reasonable* fear of *imminent* serious bodily injury. The reasonableness of M.H.W.'s fear necessarily includes an assessment of whether C.J.O. intended to carry out his threats. While M.H.W.'s fear may have stemmed from her drawing a parallel of the non-threatening language of the current text to prior communications from C.J.O., it is critical to note that they had not had communicated for the past six years, and, in fact, she had "thought he was gone" until she received the text. ***Cf. Raker***, ***supra*** (imminent fear of serious bodily injury proven under section 6102(a)(2) where alleged abuser, who lived on other side of duplex, entered petitioner's side of duplex in middle of night, scuffled with parties' son-in-law, and petitioner testified to several other incidents of violence that had occurred just four months prior).

---

[8] Although the "abuse" in ***D.H.*** was founded upon subsection 6102 of the PFAA, that section defines abuse as conduct that places the victim "in reasonable fear of bodily injury. 23 Pa.C.S. § 6102(a)(5). Here, the applicable "abuse" subsection, (a)(2), also requires "reasonable fear of bodily injury." However, that fear of the injury must be **imminent** and the fear of bodily injury be **serious**. 23 Pa.C.S. § 6102(a)(2) (emphasis added).

Moreover, while M.H.W. stated that she was "very afraid of [C.J.O.]," N.T. PFA Hearing, 4/6/16, at 9, she did not testify at any point that she feared "imminent serious bodily injury," which is required under the statute. 23 Pa.C.S. § 6102(a)(2). The instant communication consisted of a single text that ended with the sentence, "I won't bother you anymore." Finally, and most relevant, the content of the text message was non-threatening, **D.H.**., ***supra***, as it expressed C.J.O.'s love for M.H.W., regret for his past behavior, and noted that he would not bother her anymore. Accordingly, we find that the court improperly concluded that M.H.W. proved "abuse" under section 6102(a)(2) of the PFAA.

Order reversed. Jurisdiction relinquished.[9]

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/5/2016

---

[9] To the extent that M.H.W. could claim that the PFA order was entered pursuant to section 6102(a)(5), "knowingly engaging in a course of conduct," we would note that the single text sent to M.H.W. would not fit within this definition of "abuse" under the PFAA.